**Judith BARCHUS, Plaintiff,**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

**No. 5:03–CV–32–OC–10GRJ.**

United States District Court, M.D. Florida. Ocala Division.

May 4, 2004.

John V. Tucker, Anderson & Tucker, St. Petersburg, FL, for Plaintiff.

Ralph C. Losey, Akerman Senterfitt, Orlando, FL, for Defendant.

## ORDER

HODGES, District Judge.

The Plaintiff, Judith Barchus, brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, to recover for unpaid disability benefits she claims are due her as a participant or beneficiary of a long term disability plan provided by her employer, the Bombay Company, Inc., and administered by the Defendant, The Hartford Life and Accident Insurance Company. The Plaintiff maintains she is entitled to long term benefits under the plan because two back injuries she sustained rendered her "totally disabled." The Defendant paid monthly benefits to the Plaintiff for more than three years and then discontinued the payments after determining that the Plaintiff failed to submit satisfactory proof of continuing disability. The case is before the Court on cross motions for summary judgment (Docs. 11 & 26). Because the Court finds that the Defendant's decision was not arbitrary and capricious and was free of self interest, the Plaintiff's motion for summary judgment (Doc. 26) is denied and the Defendant's motion for summary judgment (Doc. 11) is granted.

### I. Background and Facts

#### A. The Group Long Term Disability Plan

Plaintiff Barchus started working for the Bombay Company ("Bombay"), a nationwide retail chain, as store manager in late 1992. She became eligible one year later to participate in the Group Long Term Disability Plan ("the plan") sponsored by Bombay and funded through a

policy issued by the Defendant, the Hartford (or Hartford).[1] Although Bombay is listed as the "plan administrator," the Defendant, as "claims administrator," exercises authority over claims processing and benefit payment. The policy explicitly grants the Defendant "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the [plan]."[2] If the Defendant determines that benefits are due under the plan, it pays them out of its own assets.

An eligible employee may claim monthly long term disability benefits if he or she becomes "totally disabled" within the meaning of the plan. For the first twenty-seven months after injury, a claimant is totally disabled if he or she is "prevented by Disability[3] from doing all the material and substantial duties of [his or her] *own occupation* on a full time basis."[4] For disability determinations made beyond the first twenty-seven months after injury the test changes, and a claimant is totally disabled if he or she is "prevented by Disability from doing *any occupation* or work for which [he or she is] or could become qualified by: (1) training; (2) education; or (3) experience."[5]

The claimant is required to submit the initial proof of disability. After benefits are approved, the Defendant may require further written proof or require the claimant to submit to examination in order to assess continued disability.[6] The Defendant explicitly reserves the right to determine if such proof is satisfactory. If the claimant fails to submit satisfactory proof of continuing disability or refuses an examination, the Defendant may terminate the claimant's benefits. Otherwise, benefits are payable until the claimant turns sixty-five years of age.[7] Claimants are also required to apply for Social Security disability benefits and seek reconsideration and appeal if the application is denied.[8]

## B. Onset of Injury and Initial Treatment [9]

The Plaintiff first injured her back on September 27, 1993 while moving a heavy item of furniture at the Bombay store. She began to experience intense pain in her lower back and radiating down her left leg. A magnetic resonance imaging (MRI) of the Plaintiff's back showed nothing of "clinical significance;" however, it did reveal "slight disc bulging" between the fourth and fifth lumbar vertebrae (L4–L5) and between L5 and the sacral vertebral

1. All of the plan documents can be found at Doc. 13, exhibit A, at BARCHUS/POLICY A.R. 000001–39 [hereinafter, Plan AR 01–39].

2. Plan AR 18.

3. "Disability" is defined to include accidental bodily injury. Plan AR 21.

4. Plan AR 19 (emphasis added). This initial definition of "totally disabled" is referred to as the "own occupation" or "own occ" test.

5. Plan AR 19. This subsequent definition of "totally disabled" is called the "any occupation" or "any occ" test for total disability.

6. Plan AR 33–35.

7. Plan AR 28. More specifically, long term disability payments will continue to age sixty-

five only if the claimant was disabled prior to attaining age sixty-two.

8. Plan AR 34.

9. A complete copy of the administrative record is found at Doc. 13, exhibit B, at Barchus A.R. 814–001 [hereinafter, AR 814–001]. The material facts of this case are not in dispute. The Court in a non-jury case such as this is entitled to draw inferences from the undisputed facts in considering the disposition of the case as a matter of law when it finds that, as is it does here, a trial on the merits would reveal no useful additional information. *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir.1978).

bone (S1). A computed tomography scan (CT scan) and myleogram showed minimal disc encroachment on the left neural recess at the L4–L5 intervertebral disc level.[10] Her treating physician at that time, Dr. M.Y. Memon, diagnosed a herniated disc at the L4–L5 level with intractable radiculopathy (abnormality of the spinal nerve root) and recommended decompressive surgery to relieve the pressure on the nerve. The Plaintiff was given Darvocet, a narcotic painkiller, and returned for light duty work activity at Bombay.

On May 18, 1994, Dr. George Sypert, a neurosurgeon, performed a decompressive hemilaminectomy and mesiofacetectomy whereby he removed portions of the Plaintiff's vertebral bone to make more room for the lumbar nerve. He then performed a foraminotomy to enlarge the opening between the vertebrae, and followed with an excision of the L4–L5 herniated disc.[11] The Plaintiff returned to work shortly after the surgery.

Although the surgery was successful, the Plaintiff continued to experience back and left leg pain at pre-operation intensity. She underwent several epidural injections and attended physical therapy sessions, but was unable to improve her symptoms. MRIs performed July 5, 1994 and September 28, 1994 revealed minimal scarring from the operation at the L4–L5 vertebrae level and around the L5 nerve root, but no disc herniation.[12] By September 1, 1994, Dr. Sypert opined that he had "reached maximum medical improvement" and resolved that he would see the patient on an as needed basis.[13] He continued to clear the Plaintiff for light work duties and restricted her lifting capacity to weights no greater than thirty pounds.[14]

Around that time (September of 1994), the Plaintiff began to see Dr. Douglas Newland, a neurologist. She continued to complain of pain in her lower back, left upper buttock, and left leg traveling to her left heel. She told Dr. Newland that having to stand all day at work was aggravating her symptoms so much so that she would limp badly at the end of the work day. Dr. Newland's impression was that the Plaintiff suffered from post-surgical left sciatica (pain throughout the left leg) with post-surgical scarring around the L5 nerve root, associated left sacroiliac and piriformis syndrome (lower back and hip pain), left L5 radiculopathy (spinal nerve root compression), post-surgical arachnoiditis (inflammation of the arachnoid membrane in the spine), physical deconditioning, and refractory obesity (the Plaintiff ranged from 185 to 200 pounds in weight and stood 5' 4" in height). Dr. Newland stressed the need for the Plaintiff to lose weight, stop smoking, exercise regularly, and remain gainfully employed. He remarked, "her ultimate level of dysfunction will reflect her willingness to maintain her physical conditioning."[15] He cleared the Plaintiff for light or sedentary work.

The Plaintiff continued to work at Bombay throughout 1995, but was frequently worn out by the end of the day and even had to take a "rare" sick day on one occasion because of her pain. She complained of increasing levels of pain, described as "disabling," "agonizing," "intolerable," and "incapacitating." Two additional MRIs were performed in 1995, but found no definitive evidence of disc

10. AR 235.

11. AR 224–17.

12. AR 205, 193.

13. AR 209.

14. AR 208.

15. AR 183 (report of Dr. Newland dated January 3, 1995).

herniation. Other than minimal bulging of the L3–L4 intervertebral disc, the MRIs revealed little change in her condition when compared with the MRI in September of 1994.[16]

Dr. Newland replaced the Plaintiff's Darvocet prescription with a prescription for Vicodin, another narcotic painkiller. He repeatedly stressed the need for the Plaintiff to lose weight, stop smoking, and curtail her narcotic dependency. He also consistently advised the Plaintiff to continue gainful employment at the light work or sedentary levels.[17] He noted, "I am somewhat lacking in a magic solution.... I continue to feel her long term solution involves her success at effective dieting, progressive stretching, and aerobic exercise."[18]

## C. The Plaintiff's Second Injury

On June 23, 1996, the Plaintiff was hospitalized after experiencing severe pain in her back and left leg following a "floor move" at Bombay in which she again moved heavy furniture around the store. She complained of terrible sharp pains and "incredible leg spasms" consistent with left L5 radiculopathy with pain radiating down her lower back, buttock, left thigh, left calf and into the left foot.[19] She stopped working at Bombay and has not worked since.

Dr. Newland suspected a possible disc herniation and ordered an MRI, performed July 17, 1996. The MRI revealed a new abnormality at the L3–L4 vertebrae showing a possible disc protrusion.[20] Dr. Newland found the abnormality to be a significant increase in the bulge reported in the earlier October 1995 MRI. He diagnosed left L4 radiculopathy secondary to an increased left L3–L4 disc herniation.[21] He continued to recommend diet, exercise, decreased narcotic dependency, and a return to work with restricted lifting to ten pounds frequent and twenty pounds maximum.[22] He found that the Plaintiff was capable of light duty work and recommended that a formal functional capacity evaluation (FCE) be performed to properly gauge her work limitations. On October 15, 1996, he remarked:

I remained frustrated and ineffective at motivating her toward weight reduction or further physical conditioning. She continues to rely on Vicodin three times a day for pain relief and likely resulting lower pain threshold.... I assured her that her continued level of physical inactivity, failed dieting efforts, continued cigarette smoking, and narcotic dependency have little chance of success. The added factor of unemployment progressively decreases her prognosis for symptomatic relief or return to gainful em-

---

**16.** AR 192, 266.

**17.** AR 288–87, 185, 182–71, 168.

**18.** AR 166 (report of Dr. Newland dated September 14, 1995). *See also e.g.,* AR 163 (report of Dr. Newland dated October 11, 1995) ("I again emphasized the need for realistic weight reduction, hamstring stretching and gentle reconditioning, rather than narcotic analgesics or further surgical intervention."); AR 158 (report of Dr. Newland dated February 17, 1996) ("I discussed with Judith the problems of continued Vicodin use, failure to exercise, and failure to have any meaningful weight reduction despite her good intentions and 'trying.' "); AR 156 (report of Dr. New-

land dated July 9, 1996) ("I am hopeful to maintain her gainful employment. I again expressed the imperative nature of her being a nonsmoker, and getting control of her diet and exercise, to make some meaningful recovery.").

**19.** AR 077 (report of Dr. Newland dated October 10, 1996).

**20.** AR 144–43.

**21.** AR 152 (report of Dr. Newland dated July 26, 1996).

**22.** AR 079–72, 038.

ployment. Symptoms at face value would make her totally disabled on a chronic basis and a statement to this effect would likely become a self-fulfilling prophecy. I continue to place her at light duty work status.... I would welcome further opinions and other treatment options, but know of none likely to work in the absence of effective physical conditioning.[23]

The Plaintiff remained out of work throughout 1997 and continued to complain of significant pain, although several injections reportedly were able to temporarily relieve some of the Plaintiff's symptoms. Dr. Newland's recommendations remained basically the same. He "reluctantly" continued to prescribe Vicodin and encouraged her return to gainful employment with limitations. "Those limitations," Dr. Newland noted, "in the future will depend largely on the patient's willingness to participate in a consistent personal exercise and reconditioning program." [24]

On April 3, 1997, a formal FCE was conducted by HeathSouth Rehabilitation Center of Ocala, an independent physical therapy center. The summary of the results is as follows:

> Deficits found in the musculoskeletal evaluation included decreased lumbar range of motion, positive bilateral straight leg raise, left lower extremity weakness, moderate soft tissue restrictions left L2–S1, and Total Waddell's of 8/16 suggesting possible symptom magnification. Dynamometer testing revealed consistent effort as demonstrated by coefficients of variance of less that 15% on 3 of the 4 tests. Functional testing revealed that Ms. Barchus is presently lifting in the SEDENTARY category of work as demonstrated by maximum occasional floor to knuckle lift of 0 pounds, knuckle to shoulder lift of 5 pounds, shoulder to overhead lift of 5 pounds, and carry of 10 pounds 100 feet with pivoting. During positional tolerance testing, the client demonstrated a tolerance of crawling, squatting, kneeling, stooping, trunk pivoting, forward reaching, pushing/pulling a 100# wheel cart, sitting, standing, and walking on an occasional basis. She was unable to maintain a hip hinge in trunk bending and was not able to safely assume the crouching position. She was only able to complete 30 second intervals of overhead reaching and ladder climbing on a rare basis.[25]

After reviewing the FCE, Dr. Newland surmised that the Plaintiff's "previous job description with retail management and materials handling was well beyond her current capacities." [26] He switched her medication from Vicodin to 10 mg of Oxy–Contin, a narcotic, every twelve hours for chronic pain. He remarked, "It appears unlikely that she will improve further on her level of physical conditioning." [27] He placed her at an 11% impairment rating.

### D. Hartford Approves Long Term Disability Benefits

The Plaintiff filed her claim for disability benefits with the Defendant on October 3, 1997, citing injuries sustained while moving heavy furniture at Bombay on September 27, 1993 and June 23, 1996.[28] A claims examiner for the Hartford, requested and received all of the medical information referenced above as well as an Attending

23. AR 077–76.

24. AR 072.

25. AR 142.

26. AR 279–78 (report of Dr. Newland dated May 29, 1997).

27. *Id.*

28. AR 001–03.

Physician's Statement (APS) filled out by Dr. Newland. In his APS, Dr. Newland reported that the Plaintiff's progress was unchanged and listed her impairment as "sedentary level per FCE" with standing, walking, sitting, pushing, pulling, and driving limited to 1/3 of the day and lifting/carrying limited to 5–10 pounds with rare overhead reaching. He stated that he believed her limitations are "static/permanent." [29]

The Plaintiff's claim was approved on June 11, 1998.[30] The notifying letter recited that the Plaintiff was eligible for benefits effective September 24, 1996.[31] It also stated that for the first two years of benefit eligibility the Plaintiff must remain totally disabled from her own occupation as store manager. The disability test change date was, therefore, set for September 24, 1998. At that time the Plaintiff would have to be totally disabled from any occupation for which she is qualified by means of training, education, or experience. The Defendant also advised the Plaintiff to apply for Social Security disability benefits.

Prior to the test change date, the Defendant received a "Physical Capacities Evaluation" (PCE) from Dr. Newland in which he opined that the Plaintiff was capable of sedentary work.[32] He recommended that the Plaintiff limit sitting to two hours; standing, walking, and driving to one hour; and occasional lifting to ten pounds maximum. Next to the phrase, "Date patient can return to work in a lighter duty capacity" he wrote "unlikely, even sedentary."

The Defendant referred the file to a medical consultant to determine if the medical records supported Dr. Newland's opinion.[33] The consultant found the medical records provided adequate support, but suggested that the Defendant ask Dr. Newland why the Plaintiff would not be capable of sedentary work if she could take frequent breaks.[34] The Defendant did not contact Dr. Newland at that time. Instead, on November 20, 1998, after "a thorough review of the information," the Defendant approved the Plaintiff's claim for long term disability beyond the test change date.[35]

On December 17, 1998, Jody Wilkins, a "clinical specialist" with the Hartford, spoke with Dr. Newland over the telephone, apparently to follow up on the consultant's suggestion.[36] According to Ms. Wilkins' notes on the conversation, Dr. Newland reaffirmed that he believed the Plaintiff's complaints of pain were supported by the objective evidence, including MRIs and other tests, and that the PCE he prepared was accurate. Dr. Newland reportedly added, however, that he also believed that the Plaintiff "wants to be disabled." He characterized the Plaintiff as the type of "litigation happy, unmotivated" person who, "no matter who you send them to or what procedures you do, . . . will remain disabled as [she is] used to the benefit." According to the notes, Dr. Newland also remarked, "as long as you keep paying her, she's going to remain disabled." Ms. Wilkins concluded that the total disability assessment "will remain

---

**29.** AR 044–43 (APS of Dr. Newland dated January 4, 1998).

**30.** AR 257–56.

**31.** The effective date of the Plaintiff's benefit approval was three months from the date of her injury because of the three month "elimination period" required by the plan. Plan AR 18, 19.

**32.** AR 321 (PCE of Dr. Newland dated June 29, 1998).

**33.** AR 719.

**34.** AR 323.

**35.** AR 324.

**36.** AR 722–21.

supported due to objective findings" and subjective statements.[37]

The Defendant continued to request and receive APS and other treatment documents from Dr. Newland. Dr. Newland again described the Plaintiff's level of functionality as sedentary with a ten pound lifting restriction. On March 30, 1999, Dr. Newland wrote that the Plaintiff was "miserable" with increasing pain.[38] He increased her Oxy–Contin prescription to 30 mg every twelve hours. He noted, "My usual recommendations for abstinence from nicotine and effective diet and exercise measures were voiced. She remains functionally disabled from *any occupation* due to her persistent pain intensity. Prior functional capacity evaluations including 4–9–97 have placed her at a sedentary work level of 5 to 10 pound lifting restrictions."[39] In April of 1999, the Defendant received another APS from Dr. Newland essentially the same as his March APS.[40] In it he stated that the Plaintiff's condition was retrogressed and her physical limitations are "static/permanent." He maintained, however, that the Plaintiff is capable of sedentary work with standing, walking, sitting, pushing, pulling, and driving limited to 1/3 of the day; lifting and carrying limited to five to ten pounds; and rare overhead reaching.

By the end of 1999, Dr. Newland reported that the Plaintiff "is simply not exercising" and "disability seems permanent in nature with little realistic change anticipated."[41] Her Oxy–Contin prescription was increased to 40 mg per twelve hour period.

## E. Hartford Terminates the Plaintiff's Benefits

The Plaintiff applied for Social Security disability benefits on June 26, 1998, shortly after the Defendant initially approved her claim for benefits under the plan. She apparently did not inform the Defendant of her application until quite sometime after, despite repeated requests by the Defendant for an update on the status of her Social Security application. Her application was administratively denied, and she requested a hearing before an Administrative Law Judge (ALJ), which was held January 27, 2000.[42]

The ALJ issued a decision on March 24, 2000 upholding the administrative denial of the Plaintiff's application for Social Security disability benefits.[43] The judge concluded that the Plaintiff's degenerative disc disease, status post herniated disc surgery, and obesity represent severe impairments. However, after reviewing all of the evidence, including a consultative examination of the Plaintiff by the Office of Disability Determinations, the judge found that the Plaintiff's "impairments are not as debilitating as alleged." He continued, "Ms. Barchus is able to perform a variety of activities of daily living and travel. Therefore, I must conclude that the claimant's allegations of severe functional limitations are in excess of the medical and 'other' evidence."[44] Accordingly, the judge concluded that the Plaintiff "is able to engage in a full range of sedentary work" and was, therefore, not "disabled" within the meaning of the Social Security regulations.

The Plaintiff did not forward a complete copy of the ALJ's decision until September 20, 2000, only after the Defendant threatened to terminate her benefits.[45] By that

---

37. AR 722.

38. AR 357–56.

39. AR 356 (emphasis added).

40. AR 335–34.

41. AR 358.

42. AR 380.

43. *Id.*

44. AR 377.

45. AR 383.

time, the Social Security Appeals Council had rejected her appeal.[46]

The Defendant then engaged an investigative service to surreptitiously surveil the Plaintiff at her residence in Michigan (the Plaintiff temporarily moved to Michigan in late 2000). Surveillance of the Plaintiff was conducted over a four day period in late March and early April of 2001. A total of approximately thirty-one hours of surveillance was performed; however, only a little over thirty minutes was recorded on video.[47] The video consists chiefly of footage of the Plaintiff driving around the city, frequently at excessive rates of speed. The most relevant footage was recorded on April 2, 2001. Over an eight hour period that day the Plaintiff is seen traveling to several business establishments, including a lumberyard, the Post Office, a bank, Home Depot, Kentucky Fried Chicken, and Wal-mart. The Plaintiff's longest stop was at Wal-mart, which lasted over two hours. Throughout the video of April 2, 2001, the Plaintiff can be seen entering and exiting her vehicle on one foot, walking without a noticeable limp, turning her neck from side to side, pushing a shopping cart loaded with groceries, bending fully at the knees to pick up items from the ground, and loading groceries into the trunk of her car.[48]

On June 26, 2001, the Plaintiff was interviewed by Hartford investigator, Ed Golden.[49] The interview lasted approximately one hour and forty-five minutes, during which time the Plaintiff was seated, except for every fifteen to twenty minutes when the Plaintiff would have to stand purportedly because of her pain. She had not been told of the surveillance prior to the interview. She stated that her condition has been deteriorating, but that injections had helped to relieve some of the pain and that she continues to use Oxy–Contin, now 80 mg twice daily. She was asked several questions about her daily activities and limitations. She responded:

> I can walk around and do the errands that I need to do. I will push myself on certain days to get things done and stay active. Sometimes I pay for it afterward but I need to keep busy and stay as active as I can. I can walk 1–2 hours and do some shopping but I could not go out all day. I may pay for being out for 2 hours and need to keep my feet up and rest the whole next day, but I do it. It really depends on the day and if I'm feeling good or not.
>
> . . .
>
> It is very difficult to sit and get comfortable. I can sit for short periods of time and then need to move around and find a more comfortable position. I can sit for 1/2 hour or so if I'm in a lying down or reclining position where I'm somewhat comfortable. It all depends on the day and how I'm feeling.
>
> . . .
>
> Standing is the same as sitting. I'm up and down a lot and find it difficult to remain in one spot for too long. I need to keep moving and change positions.
>
> . . .
>
> I can lift up to a maximum of about 10 pounds . . . I can lift a gallon of milk or some light groceries but nothing heavier than that.
>
> . . .
>
> I can bend a little at the waist but I could not bend a full 90 degrees at the waist. When bending to get something up off of the ground or floor, I must

---

46. AR 382.

47. AR 432–20.

48. AR 432.

49. AR 438.

bend with my knees and use a stooping type movement to get down.

. . .

When I turn I will turn my whole body versus twisting at the waist.

. . .

I push a full grocery cart around a store but that has wheels and I will use it for support.

. . .

I can reach over and above my head but I can not fully extend or stretch.

. . .

All my activities depend [on] if I'm having a good or bad day . . . I try to get the things I need done in the morning because I need to put my feet up on the afternoon.

. . .

I experience a pain level [out of ten] of "7" on an average day, a pain level of "6" on a good day, and a pain level of "12" on a bad day.

. . .

The sitting, walking, and standing prevent me from working. I tried to go back at one point but it did not work out. The extreme pain that I deal with everyday would be hard to work in. It would be hard for me to be a reliable employee.[50]

The Hartford's examiners believed that the video surveillance contradicted the Plaintiff's espoused level of disability and pain. Ms. Wilkins spoke with Dr. Newland a second time on August 1, 2001 to discuss the recent developments and get clarification of his return-to-work prognosis for the Plaintiff.[51] Ms. Wilkins again wrote down her recollection of the conversation. She discussed the video surveillance with Dr. Newland, but because of his past experience, Dr. Newland did not believe that video of the Plaintiff's activities would impact his analysis. Dr. Newland reportedly said that although the Plaintiff has documented disc herniations, he believed that her condition is mostly the result of a lack of motivation and effort, referring to the Plaintiff as a "dead beat" who would probably return to work if her benefits were terminated.[52] When asked why he has not simply suggested that the Plaintiff is not totally disabled from any occupation, Dr. Newland reportedly explained that he has "bought into the chronic pain program for [the Plaintiff and] that because he just does not think [the Defendant] will be able to prevent [the Plaintiff] from receiving [disability benefits], he did not feel comfortable saying she is capable of working." He then suggested that Hartford may need to be the "big bad insurance company [and] just cut [the Plaintiff's] benefits off" and that "the best strategy is not to depend on him but rather [obtain] an independent medical opinion [and] then go with whatever that doctor says." Ms. Wilkins concluded that she was "unsuccessful in determining functional ability via conversation [with Dr. Newland]," and that, therefore, she planned to refer the matter to the Medical Advisory Group (MAG), an organization of medical personnel that reviews Hartford's claims.

The matter was referred to Dr. David Peters, M.D., with the MAG.[53] Dr. Peters was asked to review the Plaintiff's medical records and video surveillance and speak with Dr. Newland in order to determine whether there is support for the Plaintiff's contention that she is unable to perform a sedentary or light duty occupation. Dr. Peters summarized his conversation with Dr. Newland in a letter addressed to Dr.

**50.** AR 436–34.

**51.** AR 734.

**52.** AR 733.

**53.** Dr. Peters signs his name above the title "Associate Medical Director for The Hartford." AR 441.

Newland.[54] He wrote, "In reviewing Ms. Barchus' medical history, you stated that although she may have evidence of lumbar pain and a history of a herniated lumbar disk, there was a very significant emotional and motivational component to her problems.... You stated that loosing [sic] weight would help her back pain and that she has failed to lose weight, exercise significantly, or to quite [sic] smoking cigarettes. You stated that there were limited neurological deficits and agreed with your notes that has [sic] indicated her ability to return to a sedentary or light duty occupation since late 1996. You felt that she had made no effort to return to work."[55] Dr. Peters concluded that the Plaintiff is capable of sedentary or light work duty and that weight reduction and physical reconditioning must be encouraged. He added that the Plaintiff is to avoid excessive standing, lifting, or bending without short hourly breaks.[56]

After Dr. Peters issued his report, Dr. Newland filed an amendment to Dr. Peters' summary of their conversation.[57] Dr. Newland agreed with the summary and added, "statistical likelihood of her loosing [sic] weight or returning to work are very small. Her chronic pain, refractory obesity and resulting *physical deconditioning* are significant limiting factors as is her narcotic dependency."[58]

On October 17, 2001, Diane Polman, a rehabilitation clinical case manager, issued an Employability Analysis Report on the Plaintiff at the behest of the Defendant.[59] The report utilizes the Occupational Access System (OASYS), a computerized job matching system, to generate a list of occupations matching the parameters of the Plaintiff's qualifications and activity restrictions. The OASYS "cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles."[60] The report was based on the conclusions reached by Dr. Peters and his conversation with Dr. Newland that the Plaintiff was capable of sedentary to light work duty with the restrictions that she avoid excessive standing, lifting, or bending without hourly breaks. These limitations and the Plaintiff's education and experience qualifications were cross referenced with the data base of job descriptions to produce a list of occupations that the Plaintiff was capable of performing. The list was narrowed by eliminating jobs that did not meet the threshold earnings potential equivalent to the amount of her monthly benefit payment. The five jobs that remained would allow the Plaintiff to control her standing activity and provide the flexibility to take breaks as needed. The five occupations listed were: Advertising Sales Representative, Order–Takers Supervisor, Route Sales–Delivery Drivers Supervisor, Automobile Rental Clerk, and Storage–Facility Rental Clerk.

Steven Pierson, senior investigative analyst for the Hartford, terminated the Plaintiff's long term disability benefits on November 16, 2001 by letter to the Plaintiff.[61] His decision was based on a review of all of the documents in the Plaintiff's file, including:

1. the Plaintiff's Application for Long Term Disability Benefits (AR 001);
2. APS prepared by Dr. Newland dated, January 3, 1998 (AR 044), March

---

54. AR 446.

55. *Id.*

56. AR 441.

57. AR 470.

58. AR 470 (emphasis in original).

59. AR 469.

60. *Id.*

61. AR 482.

16, 1998 (AR 046), April 20, 1999 (AR 335), November 22, 1999 (AR 344), September 21, 2000 (AR 385), October 3, 2000 (AR 406);

3. Long Term Disability Income Benefits Questionnaire Form prepared by the Plaintiff on March 28, 1998;

4. Medical Records from Dr. Newland covering the period November 10, 1994 through October 5, 2000;

5. results of MRI dated July 17, 1996 (AR 144);

6. PCE by Dr. Newland dated June 29, 1998 (AR 321);

7. Claimant Questionnaires completed by the Plaintiff on March 30, 1999 (AR 330) and October 6, 2000 (AR 410);

8. Social Security disability denial decision letter dated March 24, 2000 (AR 380);

9. Surveillance videotape and accompanying report depicting the Plaintiff's activities for the period March 31, April 2, and April 4 of 2001 (AR 433);

10. the Plaintiff's interview with Hartford investigator, Ed Golden on June 26, 2001 (AR 438);

11. Dr. Peters' medical review of the file and conversation with Dr. Newland dated September 27, 2001 (AR 444); and

12. Ms. Polman's Employability Analysis Report dated October 17, 2001 (AR 469).

Upon reviewing this information, Mr. Pierson concluded that the Plaintiff no longer met the plan definition of "totally disabled" as of November 1, 2001 and that no further benefits would be paid to the Plaintiff beyond October 31, 2001. He in-

formed the Plaintiff of her right to seek an appeal of the decision.

### F. Hartford Upholds its Decision to Terminate Benefits

On December 6, 2001, the Plaintiff sent a letter to Hartford requesting an appeal of the decision to terminate her benefits. She attached to her letter a document entitled "Work Status Certificate" drawn on Ocala Neurosurgical Center, Inc.'s letterhead and dated December 6, 2001. A box on the document is check next to the typed language, "is not able to return to work" and the handwritten, "until after surgery."[62] The document states that the date of surgery is pending as is the Plaintiff's next appointment. It is signed by Dr. Antonio DiSclafani, M.D.

On April 10, 2002, the Plaintiff, through her counsel, filed an argument in support of her appeal and submitted medical records from Dr. Newland dated October 5, 2000 (AR 496), May 16, 2001 (AR 495), and September 5, 2001 (AR 494) and a report of Dr. DiSclafani dated December 5, 2001 (AR 492). Dr. Newland's records are consistent with those already on file. Dr. Newland diagnosed post surgical left L5 radiculopathy, bilateral sciatica, left L4 radiculopathy symptoms, morbid obesity, refractory nicotine use, chronic pain syndrome and narcotic dependency. The reports mentions "straight leg raising, relative positivity on the right with ill-defined sciatica and right back pain, negative femoral stretch. Deep tendon reflexes 3+ at the knees and ankles, implying relatively preserved nerve function. No well defined radicular sensory loss. Grade 4/5 left footdrop and EHL weakness."

In his report dated September 5, 2001,[63] Dr. Newland "elected to discontinue providing medical services to [the Plaintiff]

---

**62.** AR 484.

**63.** AR 494. The date this report was actually prepared is not clear. The document is dated November 5, 2001. However, the text states

... based on her inability to comply with recommendations for diet, exercise, healthy life-style, and discontinuation of cigarette smoking." Dr. Newland continued,

In addition, it appears inappropriate for me to manage her care from the extreme distance, driving here from Ocala and mailing narcotic prescriptions to Michigan [where] she spent several months. She and her husband make frequent additional calls to the office requesting further narcotics and rewriting of prescriptions 'lost' in the mail, etc. I have not been effective in motivating her in a direction likely to provide any hope for meaningful recovery and resolution. I have suggested she seek a pain specialist near her area and have a single physician prescribing narcotics and directing her care. Issues of chronic disability have been raised. Indeed I noted on October 18, 2001, that "the statistical likelihood of her losing weight or returning to work are very small. Her chronic pain, refractory obesity, and resulting physical deconditioning are significant limiting factors as is her narcotic dependency," and continued nicotine dependency.[64]

Dr. DiSclafani's letter dated December 5, 2001 reads in part, "On physical examination, hyperextension test is markedly positive, exactly reproducing her pain. She has no foot-drop. Patrick's maneuver is negative. Straight leg raising causes back and left leg pain at approximately 90 .... My impression at this time is lateral recess stenosis, L3, L4, and L5. We are going to counsel her in the various programs that are available to her and give her some pain medicine which will hopefully tide her over while she is waiting to get with the Pain Clinic, the Health Department, etc." [65]

Upon receipt of all of the additional information that the Plaintiff asked to have considered, the matter was referred to the Defendant's claims appeal specialist, Amy Boys. Ms. Boys in turn referred the case to the University Disability Consortium (UDC), a group of medical personnel who review Hartford's appeals. Dr. Andrea Wagner, a doctor of physiatry with the UDC, was asked to review the evidence in the file and contact Dr. Newland and Dr. DiSclafani, to determine if the decision to deny benefits to the Plaintiff should stand. Dr. Wagner summarized her conversation with Dr. Newland in a letter dated May 8, 2002 addressed to Dr. Newland.[66] Dr. Newland reportedly said that he expected the Plaintiff's tolerance of narcotic side effects would increase with time and that her complaint of difficulty concentrating due to medication "was a subjective judgment which was not valid in this case." Dr. Newland stated that the video surveillance of the Plaintiff did not alter his assessment of the Plaintiff's condition. Dr. Newland opined that the Plaintiff was "deconditioned and would benefit from a reconditioning program." He added that he believed that the Plaintiff "was capable of a greater functionality than she has demonstrated" and that an evaluation would be necessary to determine the Plaintiff's functionality.[67] In a letter dated May 10, 2002, Dr. Newland agreed with Dr. Wagner's summary and added, "Time off work and physical deconditioning plus a disability belief system limit her return to work prognosis greatly." [68]

that it was dictated March 10, 2002 and references documents dated September 25, 2001 and October 18, 2001.

64. *Id.*

65. AR 492.

66. AR 512.

67. AR 511.

68. AR 582.

Dr. Wagner never actually spoke with Dr. DiSclafani, although she spoke with an unidentified member of Dr. DiSclafani's office staff.[69] She memorialized the conversation in a letter to DiSclafani dated May 8, 2002. She was told that the Plaintiff's diagnosis was lateral recess stenosis at L3, L4, and L5 and that epidural steroid injections had not improved her condition. She was also told that the treatment plan indicated a lumbar laminectomy at L3–L4 and L4–L5. The office staff member told Dr. Wagner that the Plaintiff had been placed on "temporary total disability" in anticipation of surgery.

Dr. Wagner issued her Medical Record Review on May 8, 2002.[70] Based on all of the information in the record detailed above and her conversations with Dr. Newland and Dr. DiSclafani's office, Dr. Wagner opined that from April of 2001 through November 1, 2001, and from November 1, 2001 to the present, the Plaintiff was "functional at a sedentary level." She recommended that restrictions "would be no repetitive flexion, extension or rotation of the lumbar spine and no lifting greater than 20 pounds." Regarding the information received from her discussion with a member of Dr. DiSclafani's staff she opined that the diagnosis of lateral recess stenosis "would be expected to impact upon [the Plaintiff's] functionality. However, there is no evidence of any impairment that would significantly affect her functionality." Concerning the surveillance tape, Dr. Wagner remarked, the "activities depicted on the video surveillance are more than what would be expected given her complaints of pain."

In a letter dated May 16, 2002, Ms. Boys notified the Plaintiff that the Hartford was taking steps to schedule a functional capacity evaluation (FCE) of the Plaintiff based on the suggestion of Dr. Newland and pursuant to the provisions of the plan.[71] A subsequent notice from Ms. Boys informed the Plaintiff and her counsel that an FCE had been scheduled for June 27, 2002.[72] Counsel for the Plaintiff responded and requested information concerning the FCE and asked if the Plaintiff may have a videographer tape the evaluation.[73] After checking with the provider, Ms. Boys told Plaintiff's counsel that the FCE provider declined the request to videotape the evaluation. She then gave the Plaintiff the option of proceeding with the FCE or rescheduling the procedure with a provider who would permit the evaluation to be filmed.[74] Two days prior to the FCE, the Plaintiff notified the Defendant that she opted to reschedule the evaluation and declined to proceed without a videographer. The FCE was rescheduled for July 30, 2002.[75] However, on the day of the FCE, Plaintiff's counsel cancelled the evaluation because the Plaintiff was unable to secure a videographer, explaining that "the situation was out of our control."[76] Her attorney requested a rescheduling with two to three weeks advanced notice.[77]

While those events were unfolding, two copies of a letter dated June 11, 2002 and signed by Dr. DiSclafani were received by the Defendant on two separate dates, June 13, and again on June 18 of 2002.[78] The

---

69. AR 513.

70. AR 514.

71. AR 559.

72. AR 580. The FCE was first scheduled for June 4, 2002, but was rescheduled by the service provider. AR 570.

73. AR 587.

74. AR 604.

75. AR 613.

76. AR 620.

77. AR 625.

78. AR 595, 603.

letters are essentially identical to the one dated December 5, 2001 from Dr. DiSclafani, except that the last paragraph reads, "My recommendation was left lumbar laminectomy surgery.... She was going to call us to schedule surgery at a later date."[79]

In a letter dated October 23, 2002, Plaintiff's counsel informed Ms. Boys that the Plaintiff just had "major spinal surgery" and that her physician advised that she would need a minimum of twelve weeks to recover.[80] Therefore, "it will be impossible for my client to attend this FCE, or any FCE in the near future." Five days later, Plaintiff's counsel sent another letter to Ms. Boys along with a copy of a "work status certificate" from Dr. DiSclafani stating that surgery was performed on the Plaintiff on October 22, 2002 and that the Plaintiff is not able to return to work until "further notice."[81] The Defendant abandoned its attempts to examine the Plaintiff and no further FCEs were scheduled.

Ms. Boys propounded on Dr. DiSclafani's office a request for the Plaintiff's medical records and any other information pertinent to the processing of the Plaintiff's appeal.[82] She received several documents in response, including a letter dated September 30, 2002 from Dr. DiSclafani referencing a 2001 visit with the Plaintiff where Dr. DiSclafani first thought that the Plaintiff needed laminectomy surgery. Dr. DiSclafani stated that nothing changed since her 2001 visit and that he recommends the Plaintiff go forward with a left unilateral laminectomy. Another document describes the October 22, 2002 surgery performed by Dr. DiSclafani. The Plaintiff underwent a left unilateral lami-

nectomy at L3, L4, and L5. Scar tissue was dissected away without difficulty. Foraminotomies were also performed and the discs were inspected and found to be non-ruptured.[83] The Plaintiff's leg pain was "somewhat improved" after surgery.[84]

On December 31, 2002, Ms. Boys prepared a letter upholding the termination of the Plaintiff's benefits.[85] The decision was based on information contained in the Plaintiff's file prior to appeal and information received since the appeal, consisting of the additional reports of Dr. Newland produced by Plaintiff's counsel, Dr. Wagner's medical record review, and Dr. DiSclafani's treatment notes for the period December 5, 2001 to the date of surgery—October 22, 2002. The Plaintiff's failure or inability to attend the scheduled FCEs was not cited as a basis for the decision to uphold the termination of benefits. Ms. Boys, who is not a doctor and has no medical certifications, wrote:

> The evidence supports that Ms. Barchus does not have the functional capacity to meet the demands of her previous job requiring medium strength demands. However, the weight of the medical evidence does not support that Ms. Barchus had functional limitations or impairments of such severity to prevent her from performing less physically demanding work at the time her LTD benefits terminated. Occupations were identified ... which are representative of less physically demanding occupations that Ms. Barchus is qualified to perform. Therefore, it is our determination that Ms. Barchus did not meet the definition of Disability contained in the claim file and no further benefits are payable.

**79.** Compare AR 492 with AR 595 and AR 603.

**80.** AR 639.

**81.** AR 640.

**82.** AR 650.

**83.** AR 663–62.

**84.** AR 664.

**85.** AR 710.

Although Ms. Barchus would have become Totally Disabled again after her surgery on October 23, 2002, Ms. Barchus' [sic] no longer had LTD coverage under [the plan], as her entitlement to benefits terminated on November 1, 2001. Therefore, no benefits are payable for any period of Disability that began after October 31, 2001.[86]

Ms. Boys then informed the Plaintiff that her file had been closed and advised her of her right to bring a civil action in federal court.

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." [87] As the Supreme Court held in *Celotex Corp. v. Catrett,* the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.[88] If the movant is successful on this score, the burden of production shifts to the nonmoving party who must then come forward with "sufficient evidence of every element that he or she must prove." [89] The non-

moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.[90]

## III. ERISA Standard of Review

■ Section 1132(a)(1)(B) of ERISA provides that a plan participant or beneficiary may bring a civil action in district court "to recover benefits due to him under the terms of his plan." ERISA, however, does not specify the standard to be applied when reviewing a claims administrator's decision to deny benefits. To fill this gap, the Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch:*

a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.[91]

■ If the plan documents explicitly grant the claims administrator discretion to determine eligibility for benefits or to construe the terms of the plan, then the claims administrator's decision to deny benefits is reviewed for abuse of discretion.[92] That is to say that the decision will not be disturbed unless it was arbitrary and capricious.[93] A decision is arbitrary and capricious if it is unreasonable in light of the evidence before the claims administrator at the time the decision was made.[94]

86. AR 710–07.

87. *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988).

88. 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

89. *Rollins v. TechSouth,* 833 F.2d 1525, 1528 (11th Cir.1987).

90. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

91. 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

92. *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 992 (11th Cir.2001).

93. *Jett v. Blue Cross & Blue Shield,* 890 F.2d 1137, 1139 (11th Cir.1989) (stating that abuse of discretion and arbitrary and capricious standards are interchangeable).

94. *Id.* ("When conducting a review of an ERISA benefits denial under an arbitrary and

This deferential standard is modified, however, in situations where the claims administrator is operating under a conflict of interest.[95] If a conflict of interest exists, then the deference afforded by arbitrary and capricious review is diminished, and the Court reviews the decision under the "heightened" arbitrary and capricious standard.[96] Once the Court determines the appropriate standard, it must apply that standard to the claims administrator's factual determinations and plan interpretation with equal force.[97]

■ The first step in determining which standard to apply is to look to the plan documents to see if the claims administrator is granted discretion to determine eligibility for benefits or to construe the terms of the plan. The Parties in this case agree that the plan documents confer such discretion on the Defendant as the plan's claims administrator.[98] Therefore, de-

pending on the existence of a conflict of interest, either the arbitrary and capricious standard or possibly the heightened arbitrary and capricious standard will apply.[99]

■ Regardless of which standard applies, the Court first "evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.'"[100] "Wrong" is the label used to describe "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation."[101] If the Court determines that the claims administrator's decision was not wrong, then summary judgment must be entered in favor of the Defendant. If, on the other hand, the Court concludes that the decision was wrong, it will then decide whether the administrator's decision was nevertheless reasonable in light of the facts known to the administrator at the time the decision was made.[102]

capricious standard ... the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.").

**95.** *HCA Health Servs.*, 240 F.3d at 993; *Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556, 1563 (11th Cir.1990) ("[T]he application of the standard is shaped by the circumstances of the inherent conflict of interest."). *See also, Firestone Tire & Rubber*, 489 U.S. at 115, 109 S.Ct. 948 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." (internal quotations omitted)).

**96.** *HCA Health Servs.*, 240 F.3d at 993. In other words, the Eleventh Circuit "has adopted the following standards for reviewing administrators' plan interpretations: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a con-

flict of interest." *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir.1997).

**97.** *Torres v. Pittston Co.*, 346 F.3d 1324,1329 (11th Cir.2003).

**98.** "The Hartford has full discretion and authority to determine eligibility benefits and to construe and interpret all terms and provisions of the [plan]." Plan AR 18.

**99.** *HCA Health Servs.*, 240 F.3d at 993.

**100.** *Id.; Brown*, 898 F.2d at 1566 n. 12; *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir.1994).

**101.** *HCA Health Servs.*, 240 F.3d at 994 n. 23.

**102.** *Id.* at 994 ("We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator under the terms of the plan."). The Court will dispense with the additional step of determining whether the Plaintiff has proposed a reasonable conclusion to rival the Defendant's conclusion. *Id.*

■ It is at this point that the Court must consider the self interest of the claims administrator.[103] If no conflict of interest exists, then the arbitrary and capricious standard requires that the claims administrator's wrong but reasonable decision must stand. If, however, a conflict of interest exists, the Court applies the heightened arbitrary and capricious standard, and the burden shifts to the claims administrator to prove that its decision was not tainted by self interest.[104] "[A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." [105] Accordingly, if the Court determines that the claims administrator has failed to meet its burden of establishing that its decision benefits the class of participants and beneficiaries, then the decision is not entitled to deference.[106] Even if the claims administrator carries its burden in this respect, the Plaintiff may still succeed if she can show that the decision is "arbitrary and capricious by other measures." [107]

## IV. Discussion

### A. Whether Hartford's Decision was "Reasonable"

■ For purposes of analysis the Court will assume, without concluding, that the Defendant's decision to terminate the Plaintiff's disability benefits, including its subsequent decision to uphold the termination, was "wrong" under a *de novo* standard of review.[108] The next step in the analysis under either the arbitrary and capricious or heightened arbitrary and capricious standard is to determine whether the Defendant's decision has some reasonable basis in the facts known to the Defendant at the time the decision was made so that the decision was not arbitrary and capricious.[109] Upon a thorough review of the administrative record and after due consideration of the Plaintiff's arguments, the Court concludes that the decision to terminate the Plaintiff's disability benefits is well supported by a reasonable basis in the facts known to the Defendant at the time the decision was made. That there is also some support for the Plaintiff's position does not render the Defendant's decision devoid of any basis in fact.[110]

Much of the evidence supplying the reasonable basis for the Defendant's decision consists of the statements of the Plaintiff's

---

103. *Id.* The Eleventh Circuit has recognized that "a strong conflict of interest exists when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims." *Brown,* 898 F.2d at 1562 (internal quotations omitted).

104. *HCA Health Servs.,* 240 F.3d at 994–95.

105. *Brown,* 898 F.2d at 1566–67.

106. *HCA Health Servs.,* 240 F.3d at 995.

107. *Brown,* 898 F.2d at 1568; *HCA Health Servs.,* 240 F.3d at 995.

108. *See Thomas v. Lockheed Martin Info. Sys.,* 155 F.Supp.2d 1316, 1324 n. 8 (N.D.Fla.2001) (noting the distinction between cases turning on legal interpretations *vis-a-vis* factual interpretations with respect to the application of *Brown* 's *de novo* "wrong" analysis). *See also, Boin v. Verizon South, Inc.,* 283 F.Supp.2d 1254, 1265 n. 8 (M.D.Ala.2003) (noting the overlap between the "wrong" analysis and the application of the arbitrary and capricious standard).

109. *Jett,* 890 F.2d at 1139.

110. *Id.* at 1140 ("As long as a reasonable basis appears for [the claims administrator's] decision, it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision.").

own treating physician, Dr. Newland. At times, however, Dr. Newland was ambiguous or equivocal in his assessment of the Plaintiff's capacity for work,[111] but his opinion was, on the whole, in accord with those of the Defendant's reviewing physicians, Drs. Peters and Wagner. Indeed, he agreed with their recapitulation of his diagnosis, including, of particular importance, his opinion that the Plaintiff was capable of "a greater functionality than she has demonstrated"[112] and able to "return to a sedentary or light duty occupation."[113] The record is replete with statements by Dr. Newland encouraging the Plaintiff's return to work. Perhaps any ambiguity in Dr. Newland's assessments may be explained by his conviction that a significant factor limiting the Plaintiff's return-to-work prognosis was her "disability belief system" and corresponding lack of motivation to work or improve her situation.[114] Dr. Newland's frustration over the Plaintiff's repeated failure to take meaningful steps to improve her condition lends credence to the conclusion that much of the Plaintiff's purported disability can be attributed to "a very significant emotional and motivational component."[115]

The Defendant need not rely solely on the statements of Dr. Newland as the reasonable basis for its decision because it gathered sufficient additional evidence on which it could reasonably conclude that the Plaintiff failed to satisfy her burden of establishing continuing total disability. A functional capacity evaluation performed by an independent rehabilitation clinic in 1997 concluded that despite the Plaintiff's functional impairments, she was capable of functioning at a sedentary level. The ALJ's decision to uphold the administrative denial of the Plaintiff's application for Social Security disability benefits concluded that the Plaintiff was not totally disabled within the meaning of the social security laws and found that the Plaintiff is capable of a full range of sedentary work.[116] Dr. Peters' and Dr. Wagner's medical record reviews, which were based in part on Dr. Newland's opinion, concluded that the Plaintiff was capable of sedentary work with restrictions on standing, sitting, walking, and lifting. Video surveillance recorded the Plaintiff engaging in activities consistent with a functionality greater than total disability. An Employability Analysis Report generated a list of five jobs for which the Plaintiff would be qualified given her education, experience, and training and controlling for her limitations and need for frequent breaks.

 The Plaintiff makes much of the fact that her subjective reports of pain and her objective medical diagnosis remained essentially unchanged (if not worsened, in the case of her complaints of pain) from the time her benefits were approved to the time they were discontinued. Contrary to the Plaintiff's contentions, the Eleventh Circuit's decision in *Levinson v. Reliance*

---

**111.** For example, in October of 1996, Dr. Newland remarked, "[The Plaintiff's] [s]ymptoms at face value would make her totally disabled on a chronic basis and a statement to that effect would likely become a self-fulfilling prophecy." AR 077.

**112.** AR 511.

**113.** AR 446.

**114.** AR 582.

**115.** AR 446.

**116.** Disability determinations under Social Security regulations are not dispositive of disability determinations under an ERISA-covered plan. *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n. 5 (11th Cir.1997). However, "[a] district court may consider the Social Security Administrator's determination of disability in reviewing a plan administrator's determination of benefits." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n. 32 (11th Cir.1994).

*Standard Life Insurance Company,*[117] does not stand for the proposition that once benefits are approved, the burden shifts to the claims administrator to establish that the claimant is no longer "totally disabled." In *Levinson,* the court concluded that the claimant met his initial burden under the policy of establishing his total disability and that, consequently, the defendant was required to produce evidence that the claimant was no longer disabled in order to justify its decision to deny benefits.[118] While the Defendant in this case initially concluded that the Plaintiff had submitted satisfactory proof of her total disability under both standards articulated in the plan, the Defendant subsequently determined that the Plaintiff failed to met her obligation to provide proof of continuing disability as required by the unambiguous terms in the plan documents. Moreover, this is not the case of a claims administrator reversing its decision on the basis of the same evidence before it when it first found a claimant to be totally disabled. On the contrary, the Defendant gathered numerous additional pieces of evidence from which it could reasonably conclude that the Plaintiff's condition was "not as debilitating as alleged." [119]

The Plaintiff's remaining arguments attempt to cast doubt on the reliability of the additional evidence obtained by the Defendant. Specifically, the Plaintiff maintains that the Defendant's decision lacked any reasonable basis in the administrative record because (1) the Defendant placed too great an emphasis on the video surveillance, (2) the Defendant failed to adequately consider the effect of the Plaintiff's deconditioning, obesity, pain, and narcotic use on her capacity to work, and (3) the Defendant did not adequately consider the

effect of the October 2002 surgery performed by Dr. DiSclafani. The Court disagrees.

The Plaintiff questions the probative value of the video surveillance in assessing the Plaintiff's functional capacity. She stresses that the video is only thirty-one minutes in length and encompasses only four days of activity. On three of those days, the Plaintiff is reported doing nothing more physically exerting than walking to the mailbox and back. She explains that the footage of her engaging in activities such as walking short distances, pushing a grocery cart, driving a car, bending at the knees to pick up items off of the ground, and loading groceries into the trunk of her car, is not indicative of her ability to work full time for five days a week. She points out that Dr. Newland viewed the tape and did not feel that it impacted his opinion of the Plaintiff's functionality. As noted above, however, Dr. Newland's opinion was that the Plaintiff was capable of sedentary work. Moreover, both Dr. Peters and Dr. Wagner felt that the video was relevant evidence of the Plaintiff's greater functionality, albeit only one piece of evidence to be considered in conjunction with other documents in the record. Accordingly, the Court cannot conclude that the Defendant's decision was arbitrary and capricious because it was based in part on the video surveillance.

There is ample evidence in the record to show that the Defendant considered the effects of the Plaintiff's deconditioning, obesity, narcotic dependency, and subjective complaints of pain. In his letter to Dr. Peters, Dr. Newland wrote, "[The Plaintiff's] chronic pain, refractory obesity and resulting physical deconditioning are significant limiting factors as is her narcotic dependency." [120] Dr. Newland did not

---

**117.** 245 F.3d 1321 (11th Cir.2001).

**118.** *Id.* at 1331.

**119.** AR 441 (report of Dr. Peters); AR 377 (decision of the Social Security ALJ).

**120.** AR 471.

believe these factors were significant enough to preclude his opinion that the Plaintiff was capable of greater functionality than demonstrated and able to work at a sedentary level. There is some evidence in the record that Oxy–Contin and epidural injections were helping to control the Plaintiff's pain. Dr. Newland also concluded that the Plaintiff's tolerance to narcotic side effects would increase with time and that her purported lack of concentration "was a subjective judgment which was not valid" in assessing her ability. These findings were echoed in the reports of Drs. Peters and Wagner, who also considered the video surveillance as indicating greater functionality. Moreover, the Employability Analysis Report prepared by the Defendant was expressly controlled for the Plaintiff's need to take hourly breaks. As these pieces of evidence show, the Plaintiff's non-exertional impairments were considered; they were simply not given the weight that the Plaintiff would like.

There is also evidence that the October 2002 surgery performed by Dr. DiSclafani was considered in the Defendant's decision. The Plaintiff's case was on appeal when the Defendant was first told of Dr. DiSclafani's treatment. Dr. Wagner, the reviewing physician during the appeal, attempted to contact Dr. DiSclafani, but succeeded only in speaking with a member of his office staff who informed her that laminectomy surgery was pending and that the Plaintiff had been placed on "temporary total disability" in anticipation of the surgery.[121] The Plaintiff concedes that this "temporary total disability" placement would preclude her return to work only until after surgery. It is not unreasonable to surmise that since the evidence of the

Plaintiff's condition prior to surgery showed a capacity for sedentary work, at some point after the Plaintiff had recuperated from the surgery she would once again achieve that level of functionality. Ms. Boys, the Defendant's appeals specialist, sought and obtained Dr. DiSclafani's medical reports on the surgery. The documents reflect that the surgery was successful and that the Plaintiff's leg pain was "somewhat improved."[122] It was not unreasonable for Ms. Boys to conclude that the surgery would likely not worsen the Plaintiff's permanent functionality impairments.

Accordingly, the Court finds that there exists a reasonable basis in the administrative record for the Defendant to conclude that the Plaintiff failed to satisfy her burden of producing sufficient evidence of her continuing total disability from any occupation for which she was qualified by her training, education, or experience and that, therefore, the discontinuance of benefit payments was warranted. However, the Court's analysis cannot end here; at this point the Court must gauge the self interest of the Defendant and, if a conflict of interest exists, consider whether the reasonable decision advances the Defendant's own interest at the expense of the affected plan beneficiaries or participants.[123]

### B. Hartford's Self–Interest

 The Defendant concedes that it operates under an inherent conflict of interest because it has discretion to determine eligibility for claims paid out of its own funds. The Eleventh Circuit has concluded that a "strong conflict of interest exists when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims."[124]

---

**121.** AR 513. *See also,* AR 485 ("Work Status Certificate" from Dr. DiSclafani's office dated December 6, 2001 stating that the Plaintiff is unable to return to work until after surgery).

**122.** AR 661–62.

**123.** *HCA Health Servs.,* 240 F.3d at 994–95.

**124.** *Brown,* 898 F.2d at 1562 (internal quotations omitted).

Therefore, the heightened arbitrary and capricious standard applies to this case.

 The application of this standard "is shaped by the circumstances of the inherent conflict of interest" and "must be contextually tailored." [125] "The degree of deference exercised in review of a fiduciary's decision ranges from slight to great, depending upon the dynamics of the decision making process." [126] "[W]hen a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest." [127] A claims administrator may satisfy this burden by justifying its decision "on the ground of its benefit to the class of all participants and beneficiaries." [128] "Even a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interest of the participants and beneficiaries." [129]

 In a heavily fact-laden inquiry such as this, as opposed to a pure question of plan interpretation, the adverse effect of a claims administrator's decision on the class of beneficiaries and participants is circumscribed by the facts of the claim before the administrator. In contrast, when a claims administrator bases its decision on plan interpretation, its decision establishes what the plan means for all beneficiaries or participants, regardless of the particular facts of their case. Thus, a "contextually tailored" modification of the arbitrary and capricious standard should reflect the narrow impact of the claims administrator's fact-based denial of a single claim *vis-a-vis* its plan interpretation.[130]

125. *Id.* at 1563–64.

126. *Id.* at 1564.

127. *Id.* at 1566.

128. *Id.* at 1567.

129. *Id.* at 1568.

130. This is not to say that with respect to fact-based decisions the claims administrator's self-interest is irrelevant to whether the decision was arbitrary and capricious. *Torres v. Pittston Co.*, 346 F.3d 1324, 1329 (11th Cir. 2003) (heightened arbitrary and capricious standard applies with equal force to factual determinations and plan interpretation). It is simply that if a claims administrator's "wrong but reasonable" fact-based decision is presumptively arbitrary and capricious due to the administrator's inherent self-interest, then it seems to this Court that the strongest argument that can be advanced to justify the decision on grounds of its benefit to the class of participants and beneficiaries is the one advanced here—the naked assertion that all participants or beneficiaries benefit in the form of lower premiums when disability payments are discontinued to claimants who cannot establish their total disability under the plan.

*See Cargile v. Confederation Life Ins. Group Plans*, 748 F.Supp. 874, 880 (N.D.Ga.1990) (rejecting the claims administrator's "naked assertion" that the taint of self-interest is purged because the administrator "is conserving and protecting the assets of the Plan for the benefit of current and future beneficiaries who really are totally disabled."). This justification is therefore dependent on just how "reasonable" the decision was in the first instance—shaky ground indeed because, to get to this point in the analysis, the court must have previously found (or assumed) that the administrator's decision was "wrong" from the perspective of a *de novo* review. The danger here is that a conflicted claims administrator's "wrong but reasonable" fact-based decision must actually be "correct" from a *de novo* perspective to avoid being overturned. *See Thomas*, 155 F.Supp.2d at 1324 n. 8 ("The effect of this Eleventh Circuit methodology is to simply apply a presumption of arbitrary and capricious to the fiduciary's interpretation in virtually every conflict scenario. If there is a presumption against the plan administrator, the burden of overcoming that presumption seems to be greater than under a *de novo* standard of review. Thus, a thoughtful reader may wonder how this 'heightened' standard retains any resemblance to an arbi-

In light of the foregoing and in accordance with the teachings of *Brown v. Blue Cross and Blue Shield*,[131] the Court will adjust the burden-shifting analysis to reflect the dynamics of a fact-intensive decision making process. In so doing, the Court recognizes several facets militating against a finding that the Defendant acted to advance its own interest rather than base its decision on the facts of the case. The amount reserved by the Defendant for the Plaintiff's claim (over $122,000.00) is slight when compared to the size of the Defendant's financial position. Further, as discussed above, the potential adverse effect of the Defendant's fact-based decision on the class of all plan participants and beneficiaries is also minimal. Moreover, the Court agrees that plan participants and beneficiaries benefit by lower premiums when the Defendant exercises its contractual right to discontinue paying benefits to claimants who fail to submit satisfactory proof of continuing disability. Finally, and importantly, the Defendant's decision is well supported in the administrative record. Accordingly, the Court is satisfied that the Defendant's decision to discontinue the Plaintiff's disability benefits was not motivated by the Defendant's own interest, but rather represents a rational decision based on the merits of the Plaintiff's case.[132]

## V. Conclusion

Accordingly, upon due consideration, it is adjudged that

(1) the Plaintiff's motion for summary judgment (Doc. 26) is DENIED;

(2) the Defendant's motion for summary judgment (Doc. 11) is GRANTED; and

(3) the Clerk is directed to enter judgment in favor of the Defendant, terminate all pending motions and close the file.

IT IS SO ORDERED.

---

trary and capricious standard."); *Callough v. E.I. du Pont de Nemours & Co.*, 941 F.Supp. 1223, 1228, n. 3 (N.D.Ga.1996) ("The heightened arbitrary and capricious standard requires the reviewing court to blend simultaneously deference with skepticism: a difficult psychological feat. For that reason, this court suspects that, in its practical application, the heightened arbitrary and capricious standard is generally going to operate much like a *de novo* standard.").

**131.** 898 F.2d 1556 (11th Cir.1990).

**132.** The Plaintiff has not presented evidence to support the conclusion that the Defendant's decision was arbitrary and capricious "by other measures."